PARKER | SCHEER LAGOMARSINO
ANDRE M. LAGOMARSINO, ESQ.
Nevada State Bar No. 6711
9555 South Eastern Avenue, Suite 210
Las Vegas, Nevada 89123
Phone: (702) 383-2864
Fax: (702) 383-0065
andre@parkerscheer.com
*Attorney for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| CELESTINE GIBSON,<br><br>    Plaintiff,<br><br>v.<br><br>LAS VEGAS METROPOLITAN POLICE DEPARTMENT, a political subdivision of the State of Nevada; OFFICER JESUS AREVALO, individually; SERGEANT MICHAEL HNATUICK, individually; and LIEUTENANT DAVID DOCKENDORF, individually<br><br>    Defendants. | CASE NO:<br><br>**COMPLAINT**<br><br>and<br><br>**JURY DEMAND** |

COMES NOW Plaintiff Celestine Gibson, by and through her attorney Andre M. Lagomarsino, Esq., and hereby files the following Complaint, alleging the following:

**JURISDICTION AND VENUE**

1. This action is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is based upon 28 U.S.C. § 1331.

2. Venue in this District is proper because all facts plead and all acts and omissions giving rise to this Complaint occurred in Clark County, Nevada in the District of Nevada.

## PARTIES TO THIS ACTION

3. At all times relevant herein, Plaintiff Celestine Gibson (hereinafter "Celestine") was the mother of Stanley LaVon Gibson, deceased. At the time of the filing of this Complaint, Celestine is 65 years of age and has outlived her son Stanley. When Stanley was alive, Celestine would spend hours on end talking with Stanley, and she loved him dearly. She is a citizen of the United States, a native Las Vegan, and a lifelong resident of the State of Nevada.

4. Decedent, Stanley LaVon Gibson (hereinafter "Stanley"), was a native Las Vegan and an honorably discharged veteran who served in the first Gulf War; his distinctions included the Air Assault Badge, Army Good Conduct Medal, Army Service Ribbon, Bronze Star for service in Desert Storm, and Kuwait Liberation Medal. As a result of his service to the United States, he suffered from post-traumatic stress disorder. He was a compassionate son who loved photography and cooking. He was just 43 years of age and unarmed when he was killed by Officer Jesus Arevalo of the Las Vegas Metropolitan Police Department on December 12, 2011. Stanley's cause of death was determined to be from multiple gunshot wounds. He was an African-American citizen of the United States and a resident of the State of Nevada at the time he was killed.

5. At all times relevant herein, Defendant Las Vegas Metropolitan Police Department (hereinafter "Metro") was, and remains, a political subdivision of the State of Nevada. Defendant Metro is a law enforcement agency entrusted to provide thorough and accurate investigation, reporting, and police protection throughout Clark County, Nevada. Defendant Metro is also responsible for the training, hiring, control and supervision of all its officers and agents as well as the implementation and maintenance of official and unofficial policies. At all times relevant herein, Metro employed Co-Defendants Jesus Arevalo, Michael Hnatuick, and David Dockendorf.

. . . .

. . . .

6.      At all times relevant herein, Defendant Jesus Arevalo (hereinafter "Arevalo") was employed as a police officer with Metro since February 2002. Arevalo is a United States citizen and, upon information and belief, a resident of Clark County, Nevada. Arevalo is being sued in his individual capacity. Prior to killing Stanley Gibson, Officer Arevalo had a history of complaints related to his job performance as an Officer with Metro.

7.      At all times relevant herein, Defendant Sergeant Michael Hnatuick (hereinafter "Hnatuick") was employed as a Sergeant with Metro. Hnatuick, in the incident that forms the basis of the instant lawsuit, was Arevalo's supervisor. Hnatuick is a United States citizen and, upon information and belief, a resident of Clark County, Nevada. Hnatuick is being sued in his individual capacity.

8.      At all times relevant herein, Defendant Lieutenant David Dockendorf (hereinafter "Dockendorf") was employed as a Lieutenant with Metro. Dockendorf, in the incident that forms the basis of the instant lawsuit, was Arevalo's supervisor. Dockendorf was a United States citizen and, upon information and belief, a resident of Clark County, Nevada. Dockendorf is being sued in his individual capacity.

9.      At all relevant times herein, all of the actions of Defendants were performed under color of state law and pursuant to their authority as police officers.

**ALLEGATIONS COMMON TO ALL CLAIMS**

10.     Paragraphs 1 through 9 are hereby specifically included and incorporated as though fully set forth herein.

**THE INCIDENT THAT TRIGGERED THE INSTANT LAWSUIT**

11.     On December 12, 2011 at approximately 12:57 a.m., Stanley LaVon Gibson was brutally killed by Officer Jesus Arevalo in the Alondra Condominium Complex parking lot in Las Vegas, Nevada. Just prior to being killed, Stanley was sitting in his car, which was pinned between Metro squad cars.

12. Officer Arevalo, for an extended period of time prior to Stanley's death, had an AR-15 assault rifle trained on Stanley's person, even though Stanley was unarmed and posed no threat to anyone. The AR-15 is a 5.56 mm, gas-operated, magazine-fed semi-automatic rifle, with a rotating-lock bolt, actuated by direct impingement gas operation or long/short stroke piston operation.

13. Earlier in the evening of December 11, 2011 at 11:23 p.m., a resident of the Alondra Condominium Complex contacted Metro and reported that two men tried to break into the resident's home.

14. Metro police officers visited the complex in response to the call. The police officers went to the complex's parking lot after speaking with the resident to acquire paperwork and noticed Stanley's car, a white Cadillac, pulling into a parking spot.

15. A witness reported seeing Stanley, prior to parking his car, slowly driving around the complex looking lost.

16. After he pulled into the parking spot, Stanley turned off his car engine and lights. He did not leave his car. He would never step out of his car alive again.

17. When the police officers advanced toward Stanley's car, he turned on the engine and attempted to back up from the parking space. His attempt was stifled by a police vehicle, which pinned his car to prevent it from moving.

18. The police officers commanded Stanley to leave his car many times. Stanley remained sitting in his car. Present at the scene were multiple officers, including but not limited to Officer Jesus Arevalo, Officer Malik Grego-Smith, Sergeant Michael Hnatuick, and Lieutenant David Dockendorf.

19. For about thirty (30) minutes, the police officers repeatedly commanded Stanley to leave his car. During this time, Stanley, who was confused and mentally distressed, remained in his vehicle with the windows rolled up. At times, Stanley started and stopped his engine multiple times, but his vehicle did not go anywhere because it remained pinned.

20. Even though the police officers could have contacted a Crisis Intervention Team or SWAT officers to assist them, they decided not to pursue these appropriate measures. Instead, they hatched a plan to assault Stanley.

21. The plan included one police officer discharging a round of bean bags from a shotgun in an effort to break the car's window. Then, another police officer would spray Stanley with Pepper spray into the broken window. During the implementation of this plan, other armed police officers would offer "cover." Arevalo offered "cover" with his AR-15 assault rifle. As was clear at the time, there was no threat from which to offer "cover." The only person in danger was Stanley Gibson.

22. The shockingly excessive plan involved a forceful physical impact to Stanley and danger to him, including having at least one long rifle trained on his body, even though he posed no immediate threat to the police officers.

23. In accordance with the plan authorized by Lieutenant Dockendorf and Sergeant Hnatuick, one police officer discharged a round into the car's rear passenger window. Officer Arevalo then fired his weapon of choice, an AR-15 assault rifle, at Stanley seven (7) times.

24. Stanley was not provided medical attention until at least five (5) minutes after he was shot. He was never transported to a hospital.

25. The police officers left Stanley's body on the ground, uncovered to a disturbing degree, for several hours after he was killed.

26. Prior to killing Stanley, other Metro police officers had killed unarmed men who, like Stanley, posed no immediate threat to the officers.

. . . .

. . . .

. . . .

. . . .

## METRO'S UNCONSTITUTIONAL POLICIES, PRACTICES, AND CUSTOMS THAT CAUSED STANLEY LAVON GIBSON'S DEATH

27. At all times relevant herein, there has been a policy, practice, and custom at Metro to slant all investigations of officer-involved shootings in favor of the shooting officer. The goal of the investigations is to concoct excuses for "bad shoots" instead of investigating these matters in a neutral fashion and punishing the shooting officers when appropriate. As a result, Metro Officers feel empowered to shoot harmless citizens, knowing that Metro will offer "cover" after the fact.

28. At all times relevant herein, there was a policy, practice, and custom at Metro to slant all internal reviews of police shootings in favor of the shooting officer. Officers would shoot unarmed people and then get a paid vacation while Metro "investigated" the shootings. Metro called this paid vacation "administrative leave." Sometimes, the officers would be off for several months while the families of their victims mourned the loss and injustice visited upon them. At the end of the internal review period by an internal Metro committee, there would be no finding of fault against the officer and no real punishment would be levied.

29. In addition to being placed on administrative leave, Arevalo was allowed 72 hours, three (3) days, to give his statement to Metro. Citizen suspects in non-police shootings are not allowed multiple days to get their story straight.

30. At all times relevant herein, there was a policy, practice, and custom at Metro to allow rifle deployment without (a) an announcement over the radio of intent to deploy, (b) an acknowledgement by communication, and (c) a response to the incident and tactical control by a field supervisor. Moreover, with respect to low lethality shotguns, prior to Stanley's death, there was no emphasis on the importance of planning and communicating among officers and supervisors, and no requirement of an announcement of intent to discharge.

31. At all times relevant herein, Metro allowed the use and deployment of AR-15 assault rifles as a disproportionate use and show of force in situations where said weapons were not needed.

32. Eerily prior to Stanley's death, The Las Vegas Review-Journal (hereinafter "LVRJ") investigated and reported about officer-involved shootings in Las Vegas in its "Deadly Force" series.

33. Over approximately the past twelve (12) years, there have been 143 deaths caused by police in Las Vegas. In 2011, eleven (11) individuals other than Stanley were killed in officer-involved shootings.

34. Since 1990, approximately 20 percent of Las Vegas police shootings involved officers firing at a car. Stanley was in his car when he was killed.

35. Since 1990, at least 25 percent of Las Vegas police shoots involved police seeing or responding to petty infractions and nonviolent offenses, then escalating them into potentially deadly altercations. Stanley was being investigated for a non-violent offense.

36. Since 1990, although less than 10 percent of the population of Las Vegas has been African-American, 32 percent of the people shot at by Las Vegas police were African-American. Stanley was African American.

37. Additionally, since 2003, approximately 20 percent of the people shot at by Las Vegas police were identified as mentally ill. Stanley was mentally ill at the time he was killed.

38. Lew Roberts (hereinafter "Roberts"), a former Metro homicide lieutenant who managed over one hundred (100) investigations into officer-involved shootings, was employed by Metro at the time of the Gibson shooting. Roberts stated in an interview that he did not believe that Metro has adequately addressed concerns about officer-involved shootings.

39. On December 15, 2011, Bill Young (hereinafter "Young"), former Metro Sheriff who was the policy maker that instituted Metro's use of AR-15 rifles, discussed Stanley's death in a State of Nevada interview with Nevada Public Radio.

40. Young stated that he was "the one who brought the rifles" to Metro solely for use in certain situations. Sheriff Young "question[ed] … why an officer had a … rifle in [this] situation." He asserted that "it was totally inappropriate, absolutely wrong for an officer to have a long gun at that close distance aimed at an individual that was apparently mentally distraught in a car and was unarmed."

41. One result of Metro's aforementioned policies, practices and customs has been that there are serious constitutional violations being imposed on Nevada citizens. Metro officers fear no real consequences so they do as they please, all the while knowing that there is a policy, practice and custom to let them off the hook in the end.

42. Innocent lives have been irreparably changed and lost at the hands of Metro officers who act contrary to the law, but all the while consistent with Metro policy, practice, and custom. Stanley LaVon Gibson's life was taken by Metro officers acting pursuant to these unconstitutional policies, practices, and procedures.

## PRIOR CASES INVOLVING METRO'S UNCONSTITUTIONAL POLICIES, PRACTICES AND CUSTOMS

43. On June 11, 2010, Trevon Cole was killed by Detective Bryan Yant of Metro during an armed raid on his small one-bedroom apartment in East Las Vegas, Nevada. He was unarmed, and there were no weapons in his apartment.

44. Trevon was squatted in front of the toilet in the process of flushing marijuana when Yant kicked in the bathroom door and intentionally shot him in the face. Yant chose an AR-15 assault rifle as his weapon of choice that evening. Cole posed no threat to Yant at any time before he was brutally killed.

45. In November 2001, Officer Bryan Yant was chasing a suspect named Richard Travis Brown. Brown was known as the "Candy Bar Robber" for his alleged role in 41 thefts.

46. After pursuing Brown in his vehicle, Yant started chasing Brown on foot. During the chase, with Brown running away from Yant, Yant shot Brown. Yant fired approximately eight (8) rounds at Brown, approximately five (5) of which hit the suspect.

47. Yant justified his conduct by saying that, as Brown was running away from him, Brown allegedly reached for a gun.

48. Yant then claimed that Brown, after being shot three (3) to four (4) times and landing face forward on the ground, tried to re-aim his gun at Yant. Yant fired three (3) to four (4) more shots at Brown. Brown was killed in the incident.

49. The physical evidence showed that Brown's alleged gun was found approximately thirty-five (35) feet away from Brown's body. It is questionable whether Brown had a gun at all or whether the gun was planted, based on the physical evidence. A Metro internal review unsurprisingly exonerated Yant despite the physical evidence.

50. In December 2003, Yant viewed a suspect, Melvin Gilchrist, who was allegedly carrying a baseball bat and a knife. Yant stated that he believed the baseball bat was a shotgun. After being commanded to stop, the suspect started running away from Yant. Yant shot the suspect in the hip. Gilchrist did not have a shotgun when he was shot by Yant. Gilchrist said he never threatened Yant before being shot. Metro's use-of-force board predictably exonerated Yant again.

51. At the time, then Undersheriff Douglas Gillespie stated publicly that Officer Yant would not be subject to any more scrutiny than any other officer involved in a shooting. Gillespie stated to a Las Vegas Review-Journal reporter that, "[He] had no concerns about Officer Yant's ability to perform as a police officer in the field."

52. In 2003, Orlando Barlow was unarmed and on his knees when he was killed by Metro Officer Brian Hartman with an AR-15 rifle when Hartman shot Barlow in the back. Metro officers celebrated this killing by creating and wearing T-Shirts that said "BDRT," which was an acronym for "**B**aby **D**addy **R**emoval **T**eam."

## FIRST CLAIM FOR RELIEF

*(Violation of Civil and Constitutional Rights of Familial Association Under 42 U.S.C. § 1983)*

(AGAINST AREVALO)

53. Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 52 as if fully set forth herein.

54. As the mother to Stanley LaVon Gibson, Plaintiff Celestine Gibson possesses a Fourteenth Amendment substantive due process right to a familial association with Stanley.

55. Defendant Arevalo, acting under color of state law, and without due process of law, violated Plaintiff's rights by the use of unreasonable, unjustified, deadly force and violence, and caused injuries which resulted in Stanley's death, all without provocation. Defendant's acts violated and deprived Plaintiff of her liberty interest arising out of her relationship with Stanley.

56. The severity of the circumstances to which the Defendant was responding was minor. Stanley had no weapons. He was pinned in his vehicle. He was not going anywhere.

57. Stanley posed no overt threat to officer safety at the outset, or at any point throughout the incident.

58. Stanley was not actively resisting arrest or actively trying to evade arrest by flight. By all accounts, he was mentally distressed, confused and unable to follow directions.

59. The incident unfolded over a period of thirty (30) minutes. Stanley was stationary in his vehicle. The situation was controlled. There were no changing circumstances during which the Defendant had to determine the type and amount of force that appeared to be necessary.

60. The plan of precipitously spraying Stanley with pepper spray and breaking his windows was harassing and punishing. Having an AR-15 assault rifle, among other dangerous weapons was unnecessary and excessive under the circumstances because Stanley posed no threat.

61. Defendant Arevalo clearly intended to harm Stanley physically when he shot him with his AR-15 assault rifle. Shooting Stanley, an unarmed and mentally distressed individual, seven (7) times with an AR-15 assault rifle was dangerously excessive under the circumstances.

62. Arevalo, along with the Lieutenant and Sergeant on the scene intended to inflict force well beyond what was required by a legitimate law enforcement objective. They did not need to kill or physically harm Stanley in order to take him into custody.

63. There were alternative methods available to the officers on the scene. The officers did not have to point their weapons at Stanley, a non-threatening citizen. Stanley's car did not have to be raided by breaking the window and disbursing pepper spray. Officer Arevalo did not need to shoot Stanley to subdue him because he was already surrounded by officers and not going anywhere. The Crisis Intervention Team could have been called out to intervene in the situation. The Officers could have waited several more hours or longer before undertaking such life-threatening actions.

64. Defendant Arevalo acted with deliberate indifference to safety when he killed Stanley. Arevalo, and his superiors on the scene, actually deliberated on a plan that included pointing an assault rifle at Stanley. Arevalo did not make a snap decision to aim his assault rifle at Stanley. Arevalo was prepared and ready to shoot well before he actually shot Stanley.

65. The behavior of Arevalo, Hnatuick and Dockendorf shocked the conscience of the community at large. Las Vegas television, radio and newspaper outlets repeatedly reported on the story. Community leaders such as former Sheriff Bill Young, Clark County District Attorney Steve Wolfson, and Clark County Commissioner Steve Sisolak have all expressed their utter shock and dismay at the Gibson shooting.

66. As a legal, direct, and proximate result, Plaintiff sustained damages for which she is entitled to compensation, including severe emotional, psychological, and mental pain and suffering.

67. These acts and others committed by the Defendant deprived Plaintiff of rights secured to her by the Fourteenth Amendment to the United States Constitution.

68. The acts described above were committed by the Defendant knowingly, willfully, and maliciously with the intent to harm, injure, vex, harass, and oppress Stanley and his family, including Plaintiff. As a result, Plaintiff should be awarded punitive and exemplary damages against Defendant Arevalo.

69. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to reasonable attorney fees and costs against Defendant Arevalo.

## SECOND CLAIM FOR RELIEF

*(Violation of Civil and Constitutional Rights of Familial Association Under 42 U.S.C. § 1983)*

(AGAINST METRO UNDER MUNICIPAL LIABILITY)

70. Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 69 as if fully set forth herein.

71. At all times relevant herein, Defendants Arevalo, Hnatuick and Dockendorf acted under color of state law.

72. As the mother to Stanley LaVon Gibson, Plaintiff Celestine Gibson possesses a Fourteenth Amendment substantive due process right to a familial association with Stanley based on her right and interest in liberty, of which she was deprived.

73. As described more fully throughout this Complaint, Metro had several policies that amounted to a deliberate indifference to Plaintiff's constitutional rights. Moreover, these policies have shocked the conscience of the Las Vegas community at large for years. These policies were the moving force, cause in fact, and proximate cause of the violations of Plaintiff's constitutional rights. These policies are referred to throughout this Complaint.

74. At all times relevant herein, Defendants Arevalo, Hnatuick and Dockendorf acted pursuant to a longstanding practice or custom of Defendant Metro to utilize the AR-15, and other powerful weapons, where no such weaponry was needed.

75. At all times relevant herein, Defendants Arevalo, Hnatuick and Dockendorf acted pursuant to and in conformity with the policies and practices delineated in the instant Complaint.

76. Prior to Stanley's death, Metro acted customarily in a fashion, as described in this Complaint, which amounted to a deliberately indifferent failure to adopt policies necessary to prevent constitutional violations. One example is the repeated shootings of unarmed individuals at close range with the AR-15 assault rifle. This excessive use of force policy, practice and custom has been repeatedly allowed to stay in place by policymakers at Metro in the years prior to Stanley's shooting.

77. As a legal, direct, and proximate result of Metro's unconstitutional policies, Plaintiff sustained damages for which she is entitled to compensation, including severe emotional, psychological, and mental pain and suffering.

78. These policies committed by Metro deprived Plaintiff of rights secured to her by the Fourteenth Amendment to the United States Constitution.

79. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to reasonable attorney fees and costs against Defendant Metro.

### THIRD CLAIM FOR RELIEF

*(Violation of Civil and Constitutional Rights of Familial Association Under 42 U.S.C. § 1983)*

(AGAINST HNATUICK)

80. Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 79 as if fully set forth herein.

81. As the mother to Stanley LaVon Gibson, Plaintiff Celestine Gibson possesses a Fourteenth Amendment substantive due process right to a familial association with Stanley.

82. Defendant Hnatuick, acting under color of state law, and without due process of law, violated Plaintiff's rights by authorizing and acquiescing to the use of unreasonable, unjustified, and deadly force and violence, which ultimately caused injuries and resulted in Stanley's death, all without provocation. Defendant's acts violated and deprived Plaintiff of her liberty interest arising out of her relationship with Stanley.

83. The severity of the circumstances to which the Defendant was responding was minor. Stanley had no weapons. He was pinned in his vehicle. He was not going anywhere.

84. Stanley posed no overt threat to officer safety at the outset, or at any point throughout the incident.

85. Stanley was not actively resisting arrest or actively trying to evade arrest by flight. By all accounts, he was mentally distressed, confused and unable to follow directions.

86. The incident unfolded over a period of thirty (30) minutes. Stanley was stationary in his vehicle. The situation was controlled. There were no changing circumstances during which the Defendant had to determine the type and amount of force that appeared to be necessary.

87. The plan of precipitously spraying Stanley with pepper spray and breaking his windows was harassing and punishing. Having an AR-15 assault rifle, among other dangerous weapons was unnecessary and excessive under the circumstances because Stanley posed no threat.

88. Defendant Hnatuick clearly intended to harm Stanley physically, and disregarded safety, when he authorized Arevalo to utilize his AR-15 assault rifle. Authorizing Arevalo to shoot Stanley, an unarmed and mentally distressed individual, was dangerously excessive under the circumstances.

89. Hnatuick, along with the Lieutenant and Officers on the scene intended to inflict force well beyond what was required by a legitimate law enforcement objective. They did not need to kill or physically harm Stanley in order to take him into custody.

90. There were alternative methods available to the officers on the scene. The officers did not have to point their weapons at Stanley, a non-threatening citizen. Stanley's car did not have to be raided by breaking the window and disbursing pepper spray. Officer Arevalo did not need to shoot Stanley to subdue him because he was already surrounded by officers and not going anywhere. The Crisis Intervention Team could have been called out to intervene in the situation. The Officers could have waited several more hours or longer before undertaking such life-threatening actions.

91. Hnatuick acted with deliberate indifference to safety when he authorized Arevalo to kill Stanley. Hnatuick, and his superiors and other officers on the scene, actually deliberated on a plan that included pointing an AR-15 assault rifle at Stanley and potentially shooting him. Arevalo did not make a snap decision to aim his assault rifle at Stanley. Arevalo was prepared and ready to shoot well before he actually shot Stanley because he was authorized to do so by Hnatuick and Dockendorf.

92. The behavior of Hnatuick, Dockendorf and Arevalo behavior shocked the conscience of the community at large. Las Vegas television, radio and newspaper outlets repeatedly reported on the story. Community leaders such as former Sheriff Bill Young, Clark County District Attorney Steve Wolfson, and Clark County Commissioner Steve Sisolak have all expressed their utter shock and dismay at the Gibson shooting.

93. As a legal, direct, and proximate result, Plaintiff sustained damages for which she is entitled to compensation, including severe emotional, psychological, and mental pain and suffering.

94. These acts and others committed by the Defendant deprived Plaintiff of rights secured to her by the Fourteenth Amendment to the United States Constitution.

95. The acts described above were committed by the Defendant knowingly, willfully, and maliciously with the intent to harm, injure, vex, harass, and oppress Stanley and his family, including Plaintiff. As a result, Plaintiff should be awarded punitive and exemplary damages against Defendant Arevalo.

96. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to reasonable attorney fees and costs against Defendant Arevalo.

### FOURTH CLAIM FOR RELIEF

*(Violation of Civil and Constitutional Rights of Familial Association Under 42 U.S.C. § 1983)*

(AGAINST DOCKENDORF)

97. Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 96 as if fully set forth herein.

98. As the mother to Stanley LaVon Gibson, Plaintiff Celestine Gibson possesses a Fourteenth Amendment substantive due process right to a familial association with Stanley.

99. Defendant Dockendorf, acting under color of state law, and without due process of law, violated Plaintiff's rights by authorizing and acquiescing to the use of unreasonable, unjustified, and deadly force and violence, which ultimately caused injuries which resulted in Stanley's death, all without provocation. Defendant's acts violated and deprived Plaintiff of her liberty interest arising out of her relationship with Stanley.

100. The severity of the circumstances to which the Defendant was responding was minor. Stanley had no weapons. He was pinned in his vehicle. He was not going anywhere.

101. Stanley posed no overt threat to officer safety at the outset, or at any point throughout the incident.

102. Stanley was not actively resisting arrest or actively trying to evade arrest by flight. By all accounts, he was mentally distressed, confused and unable to follow directions.

103. The incident unfolded over a period of thirty (30) minutes. Stanley was stationary in his vehicle. The situation was controlled. There were no changing circumstances during which the Defendant had to determine the type and amount of force that appeared to be necessary.

104. The plan of precipitously spraying Stanley with pepper spray and breaking his windows was harassing and punishing. Having an AR-15 assault rifle, among other dangerous weapons was unnecessary and excessive under the circumstances because Stanley posed no threat.

105. Defendant Dockendorf clearly intended to harm Stanley physically, and disregarded safety, when he authorized Arevalo to utilize his AR-15 assault rifle. Authorizing Arevalo to shoot Stanley, an unarmed and mentally distressed individual, was dangerously excessive under the circumstances.

106. Dockendorf, along with the Sergeant and Officers on the scene, intended to inflict force well beyond what was required by a legitimate law enforcement objective. They did not need to kill or physically harm Stanley in order to take him into custody.

107. There were alternative methods available to the officers on the scene. The officers did not have to point their weapons at Stanley, a non-threatening citizen. Stanley's car did not have to be raided by breaking the window and disbursing pepper spray. Officer Arevalo did not need to shoot Stanley to subdue him because he was already surrounded by officers and not going anywhere. The Crisis Intervention Team could have been called out to intervene in the situation. The Officers could have waited several more hours or longer before undertaking such life-threatening actions.

108. Dockendorf acted with deliberate indifference to safety when he authorized Arevalo to kill Stanley. Dockendorf, and his subordinates and other officers on the scene, actually deliberated on a plan that included pointing an AR-15 assault rifle at Stanley and potentially shooting him. Arevalo did not make a snap decision to aim his assault rifle at Stanley. Arevalo was prepared and ready to shoot well before he actually shot Stanley because he was authorized to do so by Hnatuick and Dockendorf.

109. The behavior of Hnatuick, Dockendorf and Arevalo behavior shocked the conscience of the community at large. Las Vegas television, radio and newspaper outlets repeatedly reported on the story. Community leaders such as former Sheriff Bill Young, Clark County District Attorney Steve Wolfson, and Clark County Commissioner Steve Sisolak have all expressed their utter shock and dismay at the Gibson shooting.

110. As a legal, direct, and proximate result, Plaintiff sustained damages for which she is entitled to compensation, including severe emotional, psychological, and mental pain and suffering.

111. These acts and others committed by the Defendant deprived Plaintiff of rights secured to her by the Fourteenth Amendment to the United States Constitution.

112. The acts described above were committed by the Defendant knowingly, willfully, and maliciously with the intent to harm, injure, vex, harass, and oppress Stanley and his family, including Plaintiff. As a result, Plaintiff should be awarded punitive and exemplary damages against Defendant Arevalo.

113. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to reasonable attorney fees and costs against Defendant Arevalo.

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

**WHEREFORE**, Plaintiff prays for a judgment in favor of Plaintiff and against Defendants as follows:

1. For compensatory and special damages in excess of $10,000,000.00;

2. For punitive damages in excess of $10,000,000.00;

3. For costs and attorney fees incurred in prosecuting this action in accordance with 42 U.S.C. §1988; and

4. For such further relief as the Court deems warranted.

DATED this 28th day of May, 2012.

RESPECTFULLY SUBMITTED,

PARKER | SCHEER LAGOMARSINO

/s/ Andre M. Lagomarsino
ANDRE M. LAGOMARSINO, ESQ.
Nevada State Bar No. 6711
9555 South Eastern Avenue, Suite 210
Las Vegas, Nevada 89123
Phone: (702) 383-2864
Fax: (702) 383-0065
andre@parkerscheer.com
*Attorney for Plaintiff*

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Local Rules 38-1, Plaintiff demands a trial by jury on all issues in this action.

DATED this 28th day of May, 2012.

RESPECTFULLY SUBMITTED,

PARKER | SCHEER LAGOMARSINO

_____
ANDRE M. LAGOMARSINO, ESQ.
Nevada State Bar No. 6711
9555 South Eastern Avenue, Suite 210
Las Vegas, Nevada 89123
Phone: (702) 383-2864
Fax: (702) 383-0065
andre@parkerscheer.com
*Attorney for Plaintiff*